607 A.2d 1

**BALTIMORE ARTS FESTIVAL, INC., et al.,**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

**No. 142, Sept. Term, 1991.**

Court of Appeals of Maryland.

June 8, 1992.

William Alden McDaniel, Jr. (Law Offices of William Alden McDaniel, Jr., on brief), Baltimore, for appellant.

Burton H. Levin, Asst. Sol. and Ambrose T. Hartman, Deputy Sol. (Neal M. Janey, City Sol., William R. Phelan, Jr., Senior Sol., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

McAULIFFE, Judge.

This appeal involves a dispute between the Mayor and City Council of Baltimore (the City) and two non-profit corporations, Baltimore Arts Festival, Inc. (BAF) and Maryland Community Foundation, Inc. (MCF). At the heart of the dispute is the right to ownership and control of approximately $600,000 in funds now held by MCF subject to restrictions imposed by BAF.

BAF was organized for charitable purposes, including the promotion and sponsorship of art fairs in the Baltimore metropolitan area. In 1981 the City, acting with the Mayor's Advisory Committee on Art and Culture (MACAC), entered into a written contract with BAF. The contract provided that BAF was to stage visual and performing arts programs in June of 1982 at the Mount Royal Center, a

project to be known as "Artscape '82." The City agreed to pay up to $225,500 [1] for its services, the first 25 percent to be paid upon approval of the contract by the Board of Estimates, and the balance to be paid in quarterly installments, but only to the extent necessary to reimburse BAF for documented expenditures in connection with the Artscape project.

All went well in 1982, and similar contracts were executed for Artscape projects in 1983 and 1984, calling for payment by the City of $225,500 and $162,100 respectively. BAF, in cooperation with MACAC, continued to present Artscape for the City for several years thereafter. Although no written contracts were executed for those years, the parties apparently operated under the same arrangement, and the City paid BAF additional sums for its services.

According to affidavits submitted by BAF, the costs to BAF for the presentation of Artscape during the years 1981 through 1987 exceeded the payments made by the City by approximately $361,000. BAF made up the deficit and accumulated a surplus of approximately $600,000, from funds derived from several sources, including: contributions from private donors; sales of various items during Artscape; rental fees paid by food and craft vendors who participated in Artscape; money raised from two Artscape balls; gifts from the proceeds of the Mayor's ball; and interest on various accounts and certificates of deposit.

In 1986, BAF transferred essentially all of its funds to MCF, in the form of a "restricted gift." The restrictions imposed by BAF were that the funds would be used

> to support ARTSCAPE insofar as practicable or to sponsor performances and presentations of the visual and performing arts in Baltimore City, in either case subject to consultation of an advisory committee to be composed of Jody Albright, David Baker, Robert Goldman, Marie

---

1. As was the case with all payments made by the City to BAF, the amount agreed upon was duly appropriated by the City in its annual budget.

Henderson, William Kelley, Malcolm Potter and Charles Shelton.

In a letter agreement between BAF and MCF, BAF's intent in making the gift was expressed in these words:

> The management of BAF is now changing and donors have made contributions to BAF with the expectation that those contributions would be applied for the corporate purposes of BAF ... under the personal supervision of present management of BAF. BAF desires to fulfill those expectations by establishing an endowment fund with MCF to be administered by an advisory committee ('Advisory Committee') consisting of the present management of BAF. The funds would be applied to support the present corporate purposes of BAF, particularly the Artscape function, so long as that is practical. The intent is to utilize the funds in the same manner as if BAF had continued without any change in its management.

Upon learning of these events, the City objected and demanded that the funds transferred from BAF to MCF be turned over to the City. That demand was refused, and the City filed an action in the Circuit Court for Baltimore City. By its second amended complaint the City, purporting to sue on its own behalf and "to the use of all the Artscape donors," sought to impose a constructive trust upon the funds transferred by BAF and sought an audit of the books of the defendant corporations. The City, although conceding that relations between it and BAF were the subject of written contracts, nevertheless alleged that it had "always assumed and was led to believe by BAF that the funds controlled by BAF would be used only by it to support Artscape according to the City's wishes...." Concurrent with the filing of the second amended complaint, the City filed a motion for summary judgment. The defendants responded with a motion to dismiss the complaint, or in the alternative for summary judgment.

The cross motions were heard by Judge Mabel Houze Hubbard, who considered affidavits and exhibits filed by the parties, heard argument, and ruled in favor of the City.

Judge Hubbard directed that all of the "Artscape funds" under the control of the defendant corporations be turned over to the City, to be used "exclusively for this year's Artscape Festival and for future Artscape events" under the continuing supervision of the court. The defendants appealed to the Court of Special Appeals, and we granted certiorari before the case was considered by that court. We now vacate the order granting summary judgment and remand the case for further proceedings.

▉ Initially, we note that the trial judge based her decision in part on the finding that "[s]ince BAF's solicitations, sales, and etc. were for the benefit of the public, all of the funds received from any source for Artscape were public funds subject to the CITY's control." That broad conclusion of law is incorrect. The fact that a charitable corporation raises money to benefit members of the public within a city does not mean that the funds of that corporation become city funds, or that they are subject to control by the city. When a city contracts with a charitable corporation to provide services to the public that the city has a duty or right to provide, we have held that the city has an obligation to maintain control over the subject matter of its contract with the corporation, and to require complete accountability for funds appropriated by it. *St. Mary's Indus. School v. Brown*, 45 Md. 310, 336 (1876). That does not mean, however, that the corporation with which a city contracts, or to which it contributes funds, *ipso facto* becomes an agency of the city for all purposes, or that the city may control other aspects of the corporation's activities. *Annapolis v. W. Anna. Fire & Imp. Co.*, 264 Md. 729, 734–37, 288 A.2d 151 (1972).

▉ Our review of the record in this case persuades us that disposition of the action by summary judgment was inappropriate. As Judge J. Dudley Digges wrote for this Court in *Fenwick Motor Co. v. Fenwick*, 258 Md. 134, 138, 265 A.2d 256 (1970):

In a summary judgment proceeding even where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact. *See also King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Porter v. General Boiler Casing Co.,* 284 Md. 402, 413, 396 A.2d 1090 (1979). In the case before us, it is difficult to determine whether the City contends that any City funds remain in the hands of BAF or MCF. BAF contends that under its contracts with the City it received no funds from the City except in the form of reimbursement for documented expenses—thus, by definition the City money has been spent for previous Artscape presentations. The City does not seem to seriously contest BAF"s position on this issue.

The core of the dispute centers around the funds received from donors, vendor fees, sales of items during Artscape presentations, and other sources previously mentioned. The City contends these funds were largely generated by MACAC, a City agency, as well as through the efforts of other City employees. BAF concedes that one of its principals who was instrumental in securing most of the private donations was also a principal of MACAC and solicited funds through the use of MACAC stationery. BAF contends, nevertheless, that it was the principal fund raiser, and that, in any event, all parties, including the donors, intended that the funds go to BAF and not to the City or to a City agency.

The parties seriously disagree as to whether the City presented Artscape with minimal assistance from BAF, or BAF presented Artscape with the assistance of the City, or whether it was a joint enterprise. The parties also disagree as to whether donors may have been misled concerning the use to be made of the gifts. Early on, BAF"s board determined that part of the surplus each year should be set aside to establish an endowment—a fund from which the income, and when required the principal, could be used to

support Artscape projects in the future. According to BAF, its directors were concerned that a drop in City revenues, or a change in the policy of the administration, might adversely affect the availability of City funds to such an extent that Artscape or similar projects could not be presented unless endowment funds were available. The City contends that many donors earmarked their contributions for a specific Artscape project. BAF responds that many donors did not, and that some of the major contributors were represented on the board of BAF which made the decision to establish the endowment. Moreover, BAF contends that in the absence of a specific restriction by a donor, the utilization of the donations in this fashion is entirely consistent with its charitable purposes and does not violate the general intent of the donors.

BAF argues that the City has no standing to seek the imposition of a constructive trust on behalf of donors to the fund, and if, as BAF contends, the record demonstrates that BAF has performed its contracts with the City and has fully accounted for the expenditure of all City funds, the City cannot prevail. There is broad authority that in the absence of an express reservation or condition imposed at the time the gift is made, a donor may not ordinarily seek the aid of a court for the imposition of a constructive trust upon a charitable trust, and that an action for the protection of general donors or public beneficiaries ordinarily should be brought by the Attorney General. *See, e.g., Hardman v. Feinstein,* 195 Cal.App.3d 157, 240 Cal.Rptr. 483, 485–86 (1987); *Brown v. Memorial National Home Foundation,* 162 Cal.App.2d 513, 329 P.2d 118, 132–33 (1958); *Kapiolani Park Pres. Soc. v. Honolulu,* 69 Haw. 569, 751 P.2d 1022, 1024–25 (1988); *Holden Hospital Corp. v. Southern Ill. Hosp. Corp.,* 22 Ill.2d 150, 174 N.E.2d 793, 796 (1961); *Greenway v. Irvine's Trustee,* 279 Ky. 632, 131 S.W.2d 705, 709–11 (1939); *Brown v. Concerned Citizens for Sickle Cell,* 56 Ohio St.2d 85, 382 N.E.2d 1155, 1158 (1978); *Clarke v. Oliver,* 91 Va. 421, 22 S.E. 175, 176–77 (1895); *Restatement (Second) of Trusts* § 391 (1959); G. Bogert, *The Law*

*of Trusts and Trustees* §§ 411–415 (Rev. Second ed., 1991 Repl.Vol.); IV *Scott on Trusts* § 391 (3d ed. 1967); Annot., *Who May Maintain Suit or Proceedings to Enforce or Administer Benevolent or Charitable Trusts,* 62 A.L.R. 881 (1929). *See also* § 14–307 of the Estates and Trusts Article, Maryland Code (1974, 1991 Repl.Vol.) (providing that certain sections of the Code "do not impair the rights and powers of the courts or the Attorney General with respect to any trust"). We need not and do not express any view of the merits of that argument.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS; COSTS TO ABIDE THE RESULT.